IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**WILLIE BEN ROBERTSON,**
   **Petitioner,**

**vs.**          **Case No. 3:05cv14/MCR/MD**

**LUCY HADI, Secretary,**
 **Florida Department of Children and Families,**
   **Respondent.**
_____

## REPORT AND RECOMMENDATION

   This cause is before the court upon petitioner's second amended petition for writ of habeas corpus filed under 28 U.S.C. § 2254. (Doc. 17). Respondent has filed an answer, attaching relevant portions of the state court record. (Doc. 24). Petitioner has filed a response. (Doc. 28). The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N.D. Fla. Loc. R. 72.2(B). After careful consideration of all issues raised by petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that petitioner is not entitled to relief, and that the petition is without merit and should be denied.

## BACKGROUND AND PROCEDURAL HISTORY

   On February 18, 2003 a jury of the Circuit Court of Escambia County, Florida unanimously found by clear and convincing evidence that petitioner was a sexually violent predator as defined by Florida's Involuntary Civil Commitment of Sexually Violent Predators statute known as the Jimmy Ryce Act (the "Ryce Act"). (Doc. 24,

ex. S; ex. T).[1]   On February 19, 2003 petitioner was adjudicated a sexually violent predator and committed to the custody of the Florida Department of Children and Families, to be kept in a secure facility for control, care and treatment until such time as his mental abnormality or personality disorder has so changed that it is safe for him to be at large.  (Ex. S; ex. T; ex. V, p. 308).

Petitioner, represented by counsel,  appealed the judgment to the Florida First District Court of Appeal ("First DCA"), where he raised three issues: (1) the Ryce Act is facially unconstitutional for failing to provide less restrictive alternatives; (2) the trial court erred in failing to conduct a *Nelson*[2] inquiry into trial counsel's representation; and (3) petitioner was denied effective assistance of counsel under the Sixth Amendment because trial counsel was ineffective on the face of the record. (Ex. W).  On August 3, 2004 the First DCA affirmed the judgment without written opinion.  *Robertson v. State*, 879 Fo.2d 630 (Fla. 1st Dist. Ct. App. 2004) (Table) (copy at Doc. 1, Attach.).   Petitioner commenced this federal habeas proceeding on January 14, 2005.  (Doc. 1).

# DISCUSSION

## Standard of Review

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective

---

[1]Hereafter, all references to exhibits will be to those provided at Document 24, unless otherwise noted.

[2]*Nelson v. State*, 274 So.2d 256 (Fla. 4th DCA 1973).

Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19.

In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412-13, 120 S.Ct. at 1523 (O'Connor, J., concurring).  Under the test just described a habeas court does not examine the State court's ruling to see if it

is correct, but examines it only to see if it is reasonable.  More recently, in *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003), the Supreme Court instructed that, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Id.*, 123 S.Ct. 1172.  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." *Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir. 1998).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Lockyer*, 123 S.Ct. at 1173 (quoting *Williams v. Taylor*, 529 U.S. at 405-06, 120 S.Ct. at 1519-20).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases--indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (quoting *Williams*, 529 U.S. at 405-06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application

inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams,* 529 U.S. at 409, 120 S.Ct. at 1521. Whether a State court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. *Holland v. Jackson*, 542 U.S. 647, 124 S.Ct. 2736, 2737-38, 159 L.Ed.2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001); *see also Carr v. Schofield*, 364 F.3d 1246, 1250 (11th Cir. 2004) (A state court decision involves an unreasonable application of clearly established Federal law if the State court decision "identifies the correct governing Supreme Court legal principle . . . but . . . 'refuses to extend the governing principle to a context in which the principle should have controlled.'" (quoting *Ramdass v. Angelone*, 530 U.S. 156, 166, 120 S.Ct. 2113, 2120, 147 L.Ed.2d 125 (2000))).

Section 2254(d)(1) requires more than mere error, and more even than clear error on the part of the State court before federal habeas relief may be issued. *E.g., Mitchell v. Esparza*, 540 U.S. 12, 124 S.Ct. 7, 12, 157 L.Ed.2d 263 (2003) ("We may not grant respondent's habeas petition, however, if the state court simply erred. . . ."); *Lockyer, supra*, 538 U.S. at 75, 123 S.Ct. at 1175 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); *Early v. Packer*, 537 U.S. at 11, 123 S.Ct. at 366 (State court "decisions which are not 'contrary to' clearly established Supreme Court law can be subjected to habeas relief only if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law. . . ."); *Williams, supra*,

529 U.S. at 410-12, 120 S.Ct. at 1522-23 (The State court's incorrect or erroneous application of clearly established law will be held to be reasonable and not warrant a writ so long as the State court adjudication results in a "satisfactory conclusion.").

Only if the federal habeas court finds the State court decision to be contrary to, or an unreasonable application of, clearly established Supreme Court law does it take the final step of conducting an independent review of the merits of the petitioner's claims. *Neelley*, 138 F.3d 917. Even so, the writ still will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Crawford v. Head*, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides for a "highly deferential standard of review" for factual determinations made by a state court).

Within this framework, the court will review petitioner's claims.

**Petitioner's Claims**

**Ground 1**     **The Jimmy Ryce Act Is Facially Unconstitutional And Violates Federal Law Because It Prevents The Consideration Of Least Restrictive Alternatives** (Ground 1 of Second Amended Petition)

Petitioner asserts that even those whom the State commits to civil custody retain some substantive liberty interests under the Fourteenth Amendment, and that the Ryce Act violates substantive due process because once a person is deemed a sexually violent predator, there is no consideration of treatment options in a less restrictive environment than total confinement in a secure facility.  Additionally, petitioner argues that the Americans With Disabilities Act ("ADA") mandates in Title II that a public entity provide services in the most integrated settings to qualified individuals with disabilities.  According to petitioner, persons committed as sexually violent offenders fit the definition of "qualified individuals with disabilities" due to the finding that they have serious difficulty controlling their behaviors requiring commitment.[3]  This is evidence of a "mental impairment which substantially limits one or more major life functions."  Since the Ryce Act fails to provide a least restrictive alternative, it is invalid as violative of the Constitution and the ADA.  (Doc. 17, pp. 24-30).  Respondent concedes that petitioner raised this argument in state court (in his direct appeal) and therefore exhausted his state court remedies.  (Doc. 24, p. 16).

    A.    **Clearly Established Federal Law - Substantive Due Process**

"Although freedom from physical restraint 'has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action,' that liberty interest is not absolute." *Kansas v. Hendricks*, 521 U.S. 346, 356, 117 S.Ct.

---

[3]*See* Fla. Stat. § 394.912; *see also Westerheide v. State*, 831 So.2d 93 104 (Fla. 2002) (defining those individuals subject to SVP commitment as those who have exhibited "past sexually violent behavior and [have] a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated"); *Hudson v.* State, 825 So.2d 460 (Fla. Dist. Ct. App. 1st Dist. 2002) (trial court's authority to order commitment was contingent upon finding of future dangerousness, coupled with finding of mental abnormality that rendered it difficult, if not impossible, for sex offender to control his dangerous behavior), *cause dismissed* (Fla. Oct. 17, 2002).

2072, 2079, 138 L.Ed.2d 501 (1997) (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S.Ct. 1780, 1785, 118 L.Ed.2d 437 (1992)).  "[A]n individual's constitutiojnally protected interest in avoiding physical restraint may be overridden even in the civil context." *Id.*

The Supreme Court has not addressed the particular issue presented here -- whether an involuntary commitment statute satisfies substantive due process when it requires that those committed under its scheme be totally confined in a secure facility without consideration of less restrictive alternatives.  Indeed, it appears that the only contexts in which the concept of less restrictive alternatives has been discussed is (1) as part of the argument over whether SVP laws are punitive and, therefore, violative of federal constitutional prohibitions on double jeopardy and *ex post facto* laws; and (2) in challenges to the postcommitment conditions of confinement of those involuntarily committed.

However, through the body of Supreme Court precedent involving due process challenges to involuntary commitment statutes, which will be discussed below, one governing legal principle emerges as "clearly established" under § 2254(d)(1): When determining whether an involuntary commitment statute satisfies substantive due process requirements, a court must balance the individual's liberty interest against the relevant state interests.  The nature, extent and conditions of confinement must bear some reasonable relation to the purpose for which the individual is committed.

Two of the United States Supreme Court's most recent cases concerning "the constitutional requirements substantively limiting the civil commitment of a dangerous sexual offender. . . ." are *Kansas v. Hendricks*, *supra*,  and *Kansas v. Crane*, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002).  In *Kansas v. Hendricks*, a sex offender committed under the Kansas Sexually Violent Predator Act challenged the constitutionality of that statute on the grounds that the statutory criterion for confinement embodied in the statute's words "mental abnormality or

personality disorder" did not satisfy "substantive" due process requirements.  521 U.S., at 350, 117 S.Ct., at 2076.  Hendricks also raised double jeopardy and *ex post facto* challenges to his commitment.  The Kansas Supreme Court accepted Hendricks' due process claim.  It declared that in order to commit a person involuntarily in a civil proceeding, a State is required by "substantive" due process to prove by clear and convincing evidence that the person is both mentally ill and a danger to himself or to others.  *In re Hendricks*, 259 Kan. 246, 259, 912 P.2d 129, 137 (1996).  The state court then determined that the statute's definition of "mental abnormality" did not satisfy what it perceived to be the United States Supreme Court's "mental illness" requirement in the civil commitment context.  Thus, it held that the statute violated Hendricks' substantive due process rights.  *Id.*, at 261, 912 P.2d, at 138.

The United States Supreme Court reversed, upholding the constitutionality of the Kansas Sexually Violent Predator Act.  The Court began its analysis by acknowledging that "forcible civil detainment" is necessary in limited circumstances where an individual's right to be free from restraint is outweighed by the State's interest in public health and safety.  *Id.*, at 356-57, 117 S.Ct. at 2079.  It further explained that such involuntary commitment statutes consistently have been upheld when (1) "the confinement takes place pursuant to proper procedures and evidentiary standards," (2) there is a finding of "dangerousness either to one's self or to others," and (3) proof of dangerousness is "coupled . . . with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'"  *Id.*, at 357-58, 117 S.Ct., at 2080 (citing *Heller v. Doe*, 509 U.S. 312, 314-15, 113 S.Ct. 2637, 2639-40, 125 L.Ed.2d 257 (1993) (upholding Kentucky statute permitting commitment of "mentally retarded" or "mentally ill" and dangerous individual); *Allen v. Illinois*, 478 U.S. 364, 366, 106 S.Ct. 2988, 2990-91, 92 L.Ed.2d 296 (1986) (upholding Illinois statute permitting commitment of "mentally ill" and dangerous individual); *Minnesota ex rel. Pearson v. Probate Court of Ramsey Cty.*, 309 U.S. 270, 271-72, 60

S.Ct. 523, 524-25, 84 L.Ed. 744 (1940) (upholding Minnesota statute permitting commitment of dangerous individual with "psychopathic personality")). The Court held that the statutory criterion for confinement embodied in the Kansas Sexually Violent Predator Act's words "mental abnormality or personality disorder" satisfied substantive due process requirements. *Id.*, at 356, 360, 117 S.Ct. 2072.

The Court further held that the SVP commitment proceeding was civil rather than criminal, *id.*, at 369, 117 S.Ct., at 2085; and that confinement under it did not constitute punishment. Therefore, the statute did not violate federal constitutional prohibitions on double jeopardy and *ex post facto* laws. In concluding that Kansas' SVP statute was nonpunitive, the *Hendricks* Court examined not only the Kansas Legislature's intent, but also the conditions of confinement provided by the SVP statute. In particular, the *Hendricks* Court was aware that sexually violent predators in Kansas were to be held in a segregated unit within the prison system. *Hendricks*, 521 U.S., at 368; 117 S.Ct., at 2085. That unit, however, was operated not by employees of the Kansas Department of Corrections, but by other trained individuals, and the conditions within the unit were essentially the same as those experienced by any involuntarily committed patient in the state mental institution. 521 U.S., at 363, 117 S.Ct., at 2082. Furthermore, SVPs were under the supervision of the Kansas Department of Health and Social and Rehabilitative Services, not the Kansas DOC. *Ibid.* Explaining with approval that Kansas' SVP statute called for confinement in a secure facility because the persons confined were dangerous to the community, the *Hendricks* Court noted that restricting the freedom of the dangerously mentally ill was a legitimate governmental objective. *Id.*, at 363, 117 S.Ct., at 2083. Another factor in the Court's analysis was that confinement under the SVP statute was not necessarily indefinite in duration. *Id.*, at 364, 117 S.Ct. 2072. Moreover, in addition to protecting the public, Kansas' SVP statute provided treatment for sexually violent predators. *Id.*, at 365-68, 117 S.Ct., at 2083-85. The Supreme Court acknowledged that not all mental conditions were treatable.

However, for those with untreatable conditions, there was no constitutional bar to their civil confinement because the State had a legitimate interest in protecting the public from dangerous individuals with treatable as well as untreatable conditions. *Id.*, at 366, 117 S.Ct., at 2084. Although the dissent pointed out that at the time the Kansas statute was applied to Hendricks, it "did not require the committing authority to consider the possibility of less restrictive alternatives, such as postrelease supervision, halfway houses, or other methods." *Hendricks*, 521 U.S. at 387, 117 S.Ct. 2072 (Breyer, J., dissenting), the majority of the Supreme Court apparently did not consider this failure indicative of a punitive intent, as the majority held that "involuntary confinement pursuant to the Act is not punitive." *Id.* at 369, 117 S.Ct. 2072.

In *Kansas v. Crane*, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002), the Court considered another substantive due process challenge to Kansas' SVP statute. There, a sex offender argued that in order for his commitment under that statute to comport with substantive due process the State was required to prove not merely what the statute required -- that by reason of his mental disorder he was "likely to engage in repeat acts of sexual violence" -- but also that he was unable to control his violent behavior. The United States Supreme Court rejected an absolutist approach that either permitted commitment without any lack-of-control-determination or required a finding of total or complete lack of control, holding instead that there must be "proof of serious difficulty in controlling behavior." *Id.*, at 413, 122 S.Ct., at 870. Recognizing that it was providing "less precise constitutional standard[s]" in the area of involuntary commitment statutes than the parties would have liked, the Court explained:

> the Constitution's safeguards of human liberty in the area of mental illness and the law are not always best enforced through precise bright-line rules. . . . Consequently, we have sought to provide constitutional guidance in this area by proceeding deliberately and contextually, elaborating generally stated constitutional standards and objectives as specific circumstances require.

*Id.*, at 413-14, 122 S.Ct., at 871.

In *Seling v. Young*, 531 U.S. 250, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001), the United States Supreme Court considered an SVP's "as applied" double jeopardy and *ex post facto* challenges to Washington State's sexually violent predator statute based on the conditions of his confinement (the petitioner claimed that the conditions of his confinement were too restrictive, that they were incompatible with treatment, and that the system was designed to result in indefinite confinement). *Id.*, at 262, 121 S.Ct., at 734-35. Rejecting as unworkable a scheme where an SVP statute's punitive intent would be evaluated on an "as applied" basis, the Court held that Washington State's legislative and judicial determination that its sexually violent predator statute was civil rather than criminal precluded the "as applied" double jeopardy and *ex post facto* challenges. Significantly, the Court noted that Seling's claims "were in many respects like the claims presented to the Court in *Hendricks*, where we concluded that the conditions of confinement were largely explained by the State's goal to incapacitate, not to punish." *Id.*, at 262, 121 S.Ct., at 735. Declining to address the constitutionality of the challenged conditions of confinement, the Court explained:

> Our decision today does not mean that [those] committed as sexually violent predators have no remedy for the alleged conditions and treatment regime at [their place of confinement]. . . .
>
> State courts, in addition to federal courts, remain competent to adjudicate and remedy challenges to civil confinement schemes arising under the Federal Constitution. As noted above, the Washington Supreme Court has already held that the Washington Act is civil in nature, designed to incapacitate and to treat. Accordingly, due process requires that the conditions and duration of confinement under the Act bear some reasonable relation to the purpose for which persons are committed. *Foucha v. Louisiana*, 504 U.S. 71, 79, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992); *Youngberg v. Romeo*, 457 U.S. 307, 324, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972).

*Seling, supra*, at 265, 121 S.Ct., at 736; *see Foucha v. Louisiana*, 504 U.S. 71, 79, 112 S.Ct. 1780, 1785, 118 L.Ed.2d 437 (1992) ("Due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed."); *Youngberg v. Romeo*, 457 U.S., at 321, 102 S.Ct, at 2461 (Whether the constitutional rights of one who had been involuntarily committed to a state institution for the mentally retarded were violated "must be determined by balancing his liberty interests against the relevant state interests.");[4] *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) ("[D]ue process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.");[5] *see also Allen v. Illinois*, 478 U.S. 364, 106

---

[4]*Youngberg v. Romeo*, *supra*, involved a civil rights action brought by a mentally retarded individual (Romeo) involuntarily committed to a State institution. Romeo had been committed by a court upon the petition of his mother who averred that in view of his condition she could neither care for him nor control his violence. Romeo did not challenge the validity of his commitment or the fact that he was confined in a secure facility; rather, he complained that he had been injured on numerous occasions, both by his own violence and by the reactions of other residents to him; he periodically had been physically restrained with shackles or "soft" restraints for the arms; and the institution had not provided him with appropriate treatment or programs for his mental retardation. Romeo claimed that he had constitutionally protected liberty interests in safety, freedom of movement, and training; and that administrators of the institution violated those rights.

The United States Supreme Court held that an involuntarily committed individual has substantive rights under the Due Process Clause of the Fourteenth Amendment to safety and freedom from bodily restraint. 457 U.S., at 315-16, 319-20, 102 S.Ct., at 2458, 2460. It went on to explain that "the question . . . is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint or lack of absolute safety is such as to violate due process." *Id.*, at 320, 102 S.Ct., at 2460. In determining whether a substantive liberty interest has been violated, a court must balance the individual's liberty interest against the relevant state interests. *Id.*, at 321, 102 S.Ct., at 2461. In that case, the purpose of Romeo's commitment was to provide reasonable care and safety, conditions not available to him outside of an institution. The Supreme Court held that he thus "enjoys constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests. Such conditions of confinement would comport fully with the purpose of [his] commitment." *Id.*, at 324, 102 S.Ct., at 2462.

[5]*Jackson v. Indiana*, *supra*, involved a procedural due process challenge to the validity of a criminal defendant's (Jackson's) indefinite commitment solely on account of his incompetency to stand trial. Jackson was being held indefinitely without either criminal process or civil commitment. His commitment rested on proceedings that did not consider any of the bases for exercise of the State's power of indefinite commitment (*e.g.*, dangerousness to self, dangerousness to others, or the need for care or treatment or training). The Court noted that the statutes of Indiana contained at least

S.Ct. 2988, 92 L.Ed.2d 296 (1986);[6] *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60

---

two alternatives for invoking that power -- the general civil commitment statutes and those for the commitment of the feebleminded; however, "Jackson was not afforded any formal commitment proceedings addressed to (his) ability to function in society, or to society's interest in his restraint, or to the State's ability to aid him in attaining competency through custodial care or compulsory treatment, the ostensible purpose of the commitment."  406 U.S., at 737-38, 92 S.Ct., at 1858. Explaining that "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed," *id.*, at 738, 92 S.Ct. at 1858, the Court held:

> a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future.  If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant.

*Ibid*.

[6]In *Allen v. Illinois*, *supra*, the Court considered the question whether the proceedings under the Illinois Sexually Dangerous Persons Act (Act), were "criminal" within the meaning of the Fifth Amendment's guarantee against compulsory self-incrimination.  The petitioner/SVP argued, among other things, that the statute should be deemed a criminal and not a civil proceeding because "a person adjudged sexually dangerous under the Act is committed for an indeterminate period to the Menard Psychiatric Center, a maximum-security institution that is run by the Illinois Department of Corrections and that houses convicts needing psychiatric care as well as sexually dangerous persons." *Id.*, at 372, 106 S.Ct., at 2993.  The Supreme Court rejected this argument, explaining:

> the State serves its purpose of treating rather than punishing sexually dangerous persons by committing them to an institution expressly designed to provide psychiatric care and treatment.  That the Menard Psychiatric Center houses not only sexually dangerous persons but also prisoners from other institutions who are in need of psychiatric treatment does not transform the State's intent to treat into an intent to punish.  Nor does the fact that Menard is apparently a maximum-security facility affect our analysis:  "The state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill." *Addington*, 441 U.S., at 426, 99 S.Ct., at 1809.

*Allen*, 478 U.S., at 373, 106 S.Ct., at 2994.

L.Ed.2d 447 (1979);[7] *Parham v. J. R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979);[8] *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).[9]

### B.    Clearly Established Federal Law - ADA

The clearly established Federal law in the area of petitioner's claim that the Ryce Act violates the ADA is as follows.  Title II of the ADA protects "a qualified individual with a disability."  42 U.S.C. § 12132.  In the context of the ADA, the term "disability" means:  "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (c) being regarded as having such an impairment."  42 U.S.C.A. § 12102(2) (West 2006); 28 C.F.R. § 35.104.  The ADA expressly states that "disability" does not include "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders."  42 U.S.C.A. § 12211(b)(1) (West 2006); 28 C.F.R. § 35.104.

### C.    Federal Review of State Court Decision

Petitioner raised an identical claim on direct appeal.  There, as here, he relied on *Youngberg v. Romeo, supra*, arguing that "the method of treating sexually violent predators must be scrutinized by the same federal civil rights laws which protect

---

[7]In *Bell v. Wolfish, supra*, the Supreme Court considered a challenge to pretrial detainees' confinement conditions.  The Court agreed that the detainees, not yet convicted of the crime charged, could not be punished.  However, the Court upheld those restrictions on liberty that were reasonably related to legitimate government objectives and not tantamount to punishment.  *Id.*, 441 U.S., at 539, 99 S.Ct., at 1874.

[8]In *Parham v. J.R., supra*, the Supreme Court considered a procedural due process challenge to the civil commitment of a minor with parental consent.  In determining that procedural due process did not mandate an adversarial hearing, the Court weighed the liberty interest of the individual against the legitimate interests of the State, including the fiscal and administrative burdens additional procedures would entail.  *Id.*, 442 U.S., at 599-600, 99 S.Ct., at 2502-03.

[9]In *Addington v. Texas, supra*, the Supreme Court considered a substantive due process challenge to the standard of proof required for the civil commitment of the mentally ill.  In determining the proper standard of proof, the Court assessed both the extent of the individual's interest in not being involuntarily confined indefinitely and the state's interest in committing the emotionally disturbed under a particular standard of proof.  *Id.*, 441 U.S., at 425, 99 S.Ct., at 1809.

individuals with other types of mental disabilities who are involuntarily committed," and that the Ryce Act, which "involuntarily commits all sexually violent predators to one type of program which is 'total confinement in a secure facility,' is unconstitutional because it "does not give the treating professionals nor the Department of Children and Families any discretion to consider less restrictive treatment alternatives." (Ex. W, p. 28; Doc. 17, Mem. at 28). The state court affirmed petitioner's civil commitment without written opinion. For the reasons that follow, the undersigned concludes that this decision was neither contrary to, nor an unreasonable application of, clearly established Federal law.

As the Florida Supreme Court has noted, "Florida's Ryce Act is similar to the Kansas Sexually Violent Predator Act in many respects." *Westerheide v. State*, 831 So.2d 93, 99 n.6 (Fla. 2002). The Florida Legislature enacted the Ryce Act to address the problem of managing repeat sexual offenders. Although Florida already had a statute addressing the involuntary commitment of those defined as "mentally ill," the "Baker Act," the legislature determined that existing civil commitment procedures were inadequate to confront the risks presented by "sexually violent predators." In the Ryce Act's preamble, the legislature explained:

> [A] small but extremely dangerous number of sexually violent predators exist who do not have a mental disease or defect that renders them appropriate for involuntary treatment under the [general involuntary civil commitment statute], which is intended to provide short-term treatment to individuals with serious mental disorders and then return them to the community. In contrast to persons appropriate for civil commitment under the [general involuntary civil commitment statute], sexually violent predators generally have antisocial personality features which are unamenable to existing mental illness treatment modalities, and those features render them likely to engage in criminal, sexually violent behavior. The Legislature further finds that the likelihood of sexually violent predators engaging in repeat acts of predatory sexual violence is high. The existing involuntary commitment procedures under the [general involuntary civil commitment statute] for the treatment and care of mentally ill persons are inadequate to address the risk these sexually violent predators pose to society. The Legislature further finds that the prognosis for rehabilitating sexually violent predators in a prison setting is poor, the treatment needs of this population are very long term, and the

treatment modalities for this population are very different from the traditional treatment modalities for people appropriate for commitment under the [general involuntary civil commitment statute].

Fla. Stat. § 394.910 (2003).

As a result, the legislature found it necessary to establish "a civil commitment procedure for the long-term care and treatment of sexually violent predators." *Ibid.* The legislature explained its intention "that persons who are subject to the civil commitment procedure for sexually violent predators . . . be subject to the procedures established in this part and not to the provisions of [the general involuntary civil commitment statute]. <u>Less restrictive alternatives are not applicable to cases initiated under this part.</u>" § 394.911 (emphasis added).

The Ryce Act defines a "sexually violent predator" as any person who "[h]as been convicted of a sexually violent offense; and . . . [s]uffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment." § 394.912(10). A "mental abnormality" is defined as "a mental condition affecting a person's emotional or volitional capacity which predisposes the person to commit sexually violent offenses." § 394.912(5). "Likely to engage in acts of sexual violence," in turn, means "the person's propensity to commit acts of sexual violence is of such a degree as to pose a menace to the health and safety of others." § 394.912(4).

In applying the "contrary to" prong of the AEDPA, the Eleventh Circuit has recognized that "where no Supreme Court precedent is on point, 'we cannot say that the state court's conclusion . . . is contrary to clearly established Federal law as determined by the U.S. Supreme Court.'" *Washington v. Crosby*, 324 F.3d 1263, 1265 (11th Cir. 2003) (quoting *McIntyre v. Williams*, 216 F.3d 1254, 1258 (11th Cir. 2000)). This court has not found, nor has petitioner cited, any United States Supreme Court precedent requiring the consideration of less restrictive alternatives before committing the type of dangerous sexual offender considered in *Hendricks* to

confinement in a secure facility.[10]   Nor has this court found any Supreme Court precedent that the ADA precludes the placement in a "secure facility" of a person civilly committed under a sexually violent predator act such as the Ryce Act without the consideration of less restrictive alternatives.   In light of the absence of any precedent to support petitioner's assertion, this court cannot say that the state court's denial of relief on this claim was contrary to clearly established Federal law. *Cf. Washington v. Crosby*, 324 F.3d at 1265 (holding that Florida state court's decision was not contrary to clearly established federal law because neither the petitioner nor the federal court found any Supreme Court precedent to support the petitioner's assertion); *Isaacs v. Head*, 300 F.3d 1232, 1252 (11th Cir. 2002) (same).

Nor was the state court's denial of relief "contrary to" the due process standard governing civil commitment schemes in general.   As discussed earlier, "due process requires that the conditions and duration of confinement under the Act

---

[10]The case upon which petitioner relies, *Youngberg v. Romeo, supra*, arose in a different context.   There, the involuntarily committed individual did not challenge the validity of his commitment, nor did he challenge the constitutionality of the civil commitment statute.  Rather, he challenged particular conditions of confinement provided by the State within his institution, arguing that the State failed to provide adequate safety, that it had subjected him to physical restraints (shackles), and that it failed to provide adequate treatment or training.  The *Youngberg* Court summarized the issues involved in that case as follows:

> In deciding this case, we have weighed those <u>postcommitment</u> interests cognizable as liberty interests under the Due Process Clause of the Fourteenth Amendment against legitimate state interests and in light of the constraints under which most state institutions necessarily operate. We repeat that the State concedes a duty to provide adequate food, shelter, clothing, and medical care. These are the essentials of the care that the State must provide.  The State also has the unquestioned duty to provide reasonable safety for all residents and personnel within the institution.  And it may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety or to provide needed training.  In this case, therefore, the State is under a duty to provide respondent with such training as an appropriate professional would consider reasonable to ensure his safety and to facilitate his ability to function free from bodily restraints.  It may well be unreasonable not to provide training when training could significantly reduce the need for restraints or the likelihood of violence.

*Id.*, at 324-25, 102 S.Ct., at 2462-63 (emphasis added) (citations omitted).  The undersigned does not read *Youngberg* as clearly establishing that the involuntary commitment proceeding itself consider less restrictive alternatives to confinement in a secure facility.

bear some reasonable relation to the purpose for which persons are committed." *Seling v. Young*, 531 U.S., at 265, 121 S.Ct., at 736.

As a preliminary matter, it is noted that Florida's Ryce Act meets all of the substantive due process requirements articulated by the United State Supreme Court in *Kansas v. Hendricks*, *Kansas v. Crane*, and other cases. The statute requires a determination by clear and convincing evidence that the person has exhibited past sexually violent behavior, and couples that conviction with proof of dangerousness and a current "mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment." Fla. Stat. § 394.912(10). Further, the Ryce Act provides a range of procedural safeguards to the individuals, including the assistance of counsel and mental health professionals at the commitment proceeding, Fla. Stat. § 394.916(3), (4); the right to a jury trial, *id.*, § 394.916(5); the right to appeal a sexually violent predator determination, *id.*, § 394.917(1), (3); an annual mental health examination to determine whether the person's condition has so changed that it is safe for the person to be discharged, *id.*, § 394.918; the right to petition for release, *id.*, §§ 394.918(2), 394.920; and in judicial proceedings for release, the state bears the burden of proving by clear and convincing evidence that the person's mental condition requires continued confinement, *id.*, § 394.918(4).

There is no question that Florida's purposes for the Ryce Act -- long-term mental health treatment of sexually violent predators and protection of the public from them -- are legitimate. In discussing the conditions of confinement surrounding Mr. Hendricks, conditions similar to Ryce Act detainees, the United States Supreme Court explained that "[t]he State may take measures to restrict the freedom of the dangerously mentally ill. This is a legitimate nonpunitive governmental objective and has been historically so regarded." *Hendricks*, 521 U.S., at 363, 117 S.Ct., at 2083.

Moreover, it is not unreasonable to conclude that these goals explain, and are reasonably related to, the confinement of sexually violent predators in secure facilities until such time as it is safe for them to be discharged.[11]  The secure facilities at issue are mental health facilities, not prisons.  They are operated by the

---

[11]The seminal Florida Supreme Court decision *Westerheide v. State*, *supra*, addressed the same claim petitioner makes here, and rejected it.  "Westerheide contends that the Ryce Act violates his right to due process by (1) failing to provide for less restrictive alternatives to total confinement. . . ." 831 So.2d, at 105.  "We addressed Westerheide's claims regarding less restrictive alternatives . . . in the context of his double jeopardy and ex post facto claims above [and] . . . concluded that these characteristics do not render the Ryce Act punitive.  We find this reasoning dispositive of Westerheide's due process claims as well. . . ."  *Id.*  In the earlier discussion, the *Westerheide* court determined that the Ryce Act "shares many of the hallmarks of the Kansas statute which the Supreme Court found significant in *Hendricks*:"

> On its face, the Florida statute was clearly intended to create a civil commitment scheme "to address the risk these sexually violent predators pose to society" and "to provide long-term care and treatment for these individuals." § 394.910, Fla. Stat. (2001).  While only individuals convicted of a sexually violent offense are *eligible* for commitment under the Ryce Act, the previous conviction must be coupled with a current "mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment" in order to meet the statutory definition of a sexually violent predator. § 394.912(10), Fla. Stat. (2001). . . . [T]he affirmative restraint of "a small but extremely dangerous number of sexually violent predators" who "pose [a risk] to society" because they are "likely to engage in criminal, sexually violent behavior," § 394.910, Fla. Stat. (2001), is a "classic example of nonpunitive detention." *Hendricks*, 521 U.S. at 363, 117 S.Ct. 2072.  This belies Westerheide's argument that the State is seeking retribution for a past misdeed. . . . Further, the affirmative restraint of "a small but extremely dangerous number of sexually violent predators" who "pose [a risk] to society" because they are "likely to engage in criminal, sexually violent behavior," § 394.910, Fla. Stat. (2001), is a "classic example of nonpunitive detention." *Hendricks*, 521 U.S. at 363, 117 S.Ct. 2072.

*Westerheide*, 831 So.2d, at 100.  The *Westerheide* court further explained:

> [T]he statutory definition of a sexually violent predator renders less restrictive alternatives inapplicable.  The statute requires a determination by clear and convincing evidence that the person is a sexually violent predator, that is, the person "[s]uffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment." § 394.912(10)(b), Fla. Stat. (2001) (emphasis added).  Thus, if the person is amenable to less restrictive alternative treatment he or she does not meet the statutory definition of a sexually violent predator and is not subject to commitment under the Ryce Act.

831 So.2d, at 103 (citation omitted).

Florida Department of Children and Families, not the Florida Department of Corrections.  Notably, in the *Hendricks* case, at the time the Kansas statute was applied to Hendricks it "did not require the committing authority to consider the possibility of less restrictive alternatives, such as postrelease supervision, halfway houses, or other methods."  *Hendrick*s, 521 U.S., at 387, 117  S.Ct. 2072 (Breyer, J., dissenting).  Yet, the majority of the United States Supreme Court did not consider this failure indicative of a punitive intent.  Under the Ryce Act, a similar statute, the committing authority in Florida <u>does</u> consider the possibility of less restrictive alternatives in that "if the person is amenable to less restrictive alternative treatment he or she does not meet the statutory definition of a sexually violent predator and is not subject to commitment under the Ryce Act." *Westerheide*, 831 So.2d, at 103.[12] The committing authority's decision is aided by the opinions of qualified mental health experts.  Interestingly, the petitioner in this case does not claim that those committed under the Ryce Act are not dangerous to themselves or others, do not have a mental illness or mental abnormality, do not have serious difficulty in controlling their behavior, or do not need a secure facility for their own and other's protection.  Nor does petitioner claim that the confinement of SVPs in secure mental health facilities bears no relation to Florida's legitimate interests.

In light of the foregoing, this court cannot say that the state appellate court's affirmance of petitioner's commitment was contrary to the United States Supreme Court's Fourteenth Amendment jurisprudence.  Nor can this court find that the state court's decision involved an unreasonable application of clearly established Federal law.  The due process principles discussed *supra* elaborate a "generally stated constitutional standard[ ]," *Kansas v. Crane*, 534 U.S., at 414, 122 S.Ct., at 871. In

---

[12]Indeed, in petitioner's case, the jury was instructed that to prove petitioner is a sexually violent predator, "the State must prove each of the following three elements by clear and convincing evidence.  A; Willie Robertson has been convicted of a sexually violent offense; and B; Willie Robertson suffers from a mental abnormality or personality disorder; and C; the mental abnormality or personality disorder makes him likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment."  (Ex. V, p. 297).

denying relief, the state court's application of Supreme Court law "fit[ ] within the matrix" of the Supreme Court's prior decisions. *Yarborough v. Alvarado*, 541 U.S. 652, 665, 124 S.Ct. 2140, 2150, 158 L.Ed.2d 938, (2004); *see id.*, 541 U.S., at 664, 124 S.Ct., at 2149 ("Applying a general standard to a specific case can demand a substantial element of judgment. . . . The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.").

Petitioner's remaining argument is that the Ryce Act violates the ADA by mandating that those committed be totally confined in a secure facility without the consideration of less restrictive alternatives. As demonstrated above, Congress has specifically excluded petitioner's disorder from coverage under the ADA. *See, e.g.*, *Bilal v. Regier*, Case Number 3:02cv362/LAC/MD (N.D. Fla. Sept. 14, 2004) (rejecting same argument that the Ryce Act violates the ADA; finding that the mental abnormality prompting the SVP determination is a condition excluded from the scope of the ADA); *Hawkins v. Michigan Parole Bd.*, 187 F.3d 635 (6th Cir. 1999) (Table, Text in Westlaw) (affirming district court's conclusion that prisoner's alleged propensity for sexual misbehavior did not constitute a "disability" within the meaning of the ADA); *Johnson v. Santa Clara County*, 2003 WL 22114269 (N.D. Cal. Sep 05, 2003) (unpublished decision) (holding that people who pose a significant risk to the health or safety of others that cannot be ameliorated by means of a reasonable modification are not "qualified individuals" covered by Title II (citing *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 735 (9th Cir. 1999))).  Because the mental abnormality prompting the SVP determination is a condition excluded from the scope of the ADA, the state court's denial of relief on this claim was neither contrary to, nor an unreasonable application of, clearly established Federal law.

　　　Ground 2   Denial of *Nelson* Hearing (Ground 2 of Second Amended Petition)

Petitioner next contends the trial court "abused its discretion" and failed to follow Florida law when it failed to hold a *Nelson* inquiry after petitioner wrote a

letter to the judge: (1) voicing complaints that counsel failed to respond to two telephone calls and failed to return some papers, and (2) asking that his counsel be "excused" from petitioner's case because the Department of Children and Families had sent two psychologists to evaluate him as a candidate for involuntary commitment as a sexually violent predator.[13]  Petitioner contends that the trial court should have construed his letter as a motion to dismiss counsel and conducted the type of inquiry mandated by Florida law pursuant to *Nelson v. State*, 274 So.2d 256 (Fla. 4th Dist. Ct. App. 1973).  This claim may be disposed of summarily.

*Nelson* held that in order to protect an indigent criminal defendant's right to the effective assistance of appointed counsel, where it appears that the defendant wishes to discharge his attorney, the trial court should make an inquiry as to the reason for the request to discharge.  274 So.2d at 258.  If incompetency of counsel is the reason, the court must inquire further to see if effective assistance of counsel is being rendered.  *Id.* at 259.  The ultimate purpose of the inquiry is to determine whether there is sufficient justification to discharge the first lawyer and appoint a second.  *Id.*

Respondent contends this is an issue of state law and provides no basis for federal habeas relief.  Respondent is correct.  Federal habeas relief is not available to reexamine state decisions on its own procedural rules.  *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Wallace v. Turner*, 695 F.2d 545, 548 (11th Cir. 1983) (procedural rule); *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1989) (sentencing guidelines); *Carrizales v. Wainwright*, 699 F.2d 1053, 1054-55 (11th Cir. 1987) (jury instruction).  Moreover, even if the trial court violated the *Nelson* rule, a violation of a state rule of procedure or of a state law is not itself a violation of the

---

[13]The connection between counsel and those visits is unclear, but appears to be nonexistent, as this event apparently occurred when petitioner was in prison, before the petition was filed.  DCF sent two psychologists to interview petitioner while he was being evaluated as a candidate for SVP commitment.  (Ex. B, pp. 9-10; Ex. C, p. 21).  Counsel was not appointed until after the petition was filed two months later.  (Ex. A, p. 1).

federal constitution. *Engle v. Isaac*, 456 U.S. 107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982).  No case has been cited for the proposition that the federal constitution mandates the *Nelson* procedure, and this court has found none.  It must be concluded, as argued by respondent, that this is purely an issue of state law not cognizable in this habeas proceeding.

     <u>Ground 3</u>     <u>Ineffective Assistance Of Trial Counsel</u> (Ground 3 of Second Amended Petition)

     Petitioner's last claim is that he was denied his Sixth Amendment right to the effective assistance of counsel at his civil commitment trial.  Relying on Florida law, he asserts that individuals who face involuntary commitment to a mental health facility pursuant to Florida's general civil commitment statute have the right to counsel; thus those facing commitment under the Ryce Act also have that right.  Relying on the law of other states, petitioner contends that since counsel is appointed to represent an individual facing commitment under the Ryce Act, the individual has a constitutional right to effective assistance of counsel. (Doc. 17, Mem. at 33).  The grounds upon which petitioner contends counsel was constitutionally ineffective are that counsel failed to object to certain testimony and the prosecutor's closing argument.  Petitioner raised this identical claim on direct appeal.  Respondent asserts a procedural default defense, arguing that petitioner failed to present his IAC claim to the state courts in a procedurally correct manner.  Alternatively, respondent contends this claim is without merit.

     A.     Applicability of Sixth Amendment Right to Effective Assistance of Counsel to Involuntary Commitment Proceedings

     It is clear that the full panoply of rights afforded criminal defendants under the Constitution are not applicable to Ryce Act defendants because the Ryce Act is not criminal in nature.  *See, e.g., Allen v. Illinois*, 478 U.S. 364, 371-72, 106 S.Ct. 2988, 92 L.Ed.2d 296 (1986) (holding that proceedings under Illinois' Sexually Dangerous Persons Act were not "criminal" within the meaning of the Fifth Amendment's guarantee against compulsory self-incrimination, and also finding that, even though

some safeguards applicable to criminal proceedings were provided for by statute, the proceedings were not converted into criminal proceedings as a result thereof); *see also Kansas v. Hendricks*, *supra* (holding that proceedings under Kansas' Sexually Violent Predator Act were not "criminal" and therefore petitioner was not subject to punishment for purposes of double jeopardy and *ex post facto* clauses); *see generally United States v. Budell*, 187 F.3d 1137, 1141 (9th Cir. 1999) (noting that because a commitment hearing is a civil matter, the constitutional rights to which a defendant in a criminal trial is entitled do not adhere to a respondent in a commitment hearing). The "fact that a proceeding will result in loss of liberty does not ipso facto mean that the proceeding is a 'criminal prosecution' for purposes of the Sixth Amendment." *Middendorf v. Henry*, 425 U.S. 25, 37, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976).

The United States Supreme Court has not addressed the question of whether a Sixth Amendment right to counsel in civil commitment proceedings exists, and lower federal courts appear divided on the issue. *Compare Woolley v. Ashbridge*, -- F.Supp.2d –, 2006 WL 13102 (M.D. Pa. Jan. 3, 2006) (assuming, without deciding, that a right to effective assistance of counsel exists in civil commitment proceedings); *and Woodard v. Maybery*, 242 F.Supp.2d 695, 708 (N.D. Cal. 2003) (same); *and Poole v. O'Keefe*, 2002 WL 550961 (D. Minn. 2002) (same); *with Young v. King County*, 70 Fed.Appx. 939 (9th Cir. 2003) (unpublished decision) (holding that offender committed under Washington's Sexually Violent Predator statute was not entitled to effective assistance of counsel in civil commitment hearing, barring § 1983 claim alleging violation of his Sixth Amendment rights during hearing); *see also Carty v. Nelson*, 426 F.3d 1064, 1073 (9th Cir. 2005) (holding that the Sixth Amendment right to confrontation does not attach in civil commitment proceedings, including SVP proceedings). Furthermore, some courts have concluded that an indigent has a due process right to the appointment of counsel in civil commitment proceedings; however, those courts have not articulated a standard for determining whether

counsel was "ineffective" such as to violate due process. *E.g., Lynch v. Baxley*, 386 F.Supp. 378, 389 (M.D. Ala. 1974) (stating that due process applies to involuntary civil commitments, and that "[t]he subject of an involuntary civil commitment proceeding has the right to the effective assistance of counsel at all significant stages of the commitment process"); *Heryford v. Parker*, 396 F.2d 393, 396 (10th Cir. 1968) ("It is the likelihood of involuntary incarceration -- whether for punishment as an adult for a crime, rehabilitation as a juvenile for delinquency, or treatment and training as a feeble-minded or mental incompetent -- w[hich] commands observance of the constitutional safeguards of due process.  Where . . . the state undertakes to act in parens patriae, it has the inescapable duty to vouchsafe due process, and this necessarily includes the duty to see that a subject of an involuntary commitment proceedings is afforded the opportunity to the guiding hand of legal counsel at every step of the proceedings, unless effectively waived by one authorized to act in his behalf."); *Dorsey v. Solomon*, 435 F.Supp. 725, 733 (D.C. Md. 1977) (holding that an indigent has a due process right to be represented by appointed counsel at involuntary civil commitment hearing); *Bell v. Wayne County General Hospital At Eloise*, 384 F. Supp. 1085 (E.D. Mich. 1974) (holding that involuntary civil commitment statute violated due process requirements where it did not provide for right to counsel, to appointed counsel if indigent, or notification of this right at outset of proceedings); *see also Pullen v. State*, 802 So.2d 1113, 1116-19 (Fla. 2001) (holding that individual who faces involuntary civil commitment to mental health facility has a liberty interest at stake, and accordingly, individual has a due process right to effective assistance of counsel at all significant stages of commitment process).

Inasmuch as the Ryce Act gives indigent respondents the right to have counsel appointed to represent them, and that when liberty interests are at stake such appointed counsel must be competent, the undersigned assumes for the sake

of discussion (but does not decide), that a constitutional right to effective assistance of counsel in involuntary civil commitment proceedings exists.

   **B. Exhaustion and Procedural Default**

   Respondent asserts that petitioner failed to present this claim to the state court in a procedurally correct manner because instead of availing himself of Florida Rule of Civil Procedure 1.530 or 1.540(b), procedures which "might furnish a vehicle for raising ineffective assistance of counsel claims in state court," petitioner raised his claim on direct appeal.  Arguing that this was arguably improper, and that it is too late for petitioner to return to state court to avail himself of those procedures, respondent contends petitioner's IAC claim is procedurally defaulted.

   This court cannot conclude that the Florida appellate court refused to consider petitioner's IAC claim on direct appeal.  In responding to petitioner's initial brief, the State argued that to the extent SVP respondents have a right to effective assistance of counsel, the best forum for them to litigate such a claim is the trial court because a trial court "can . . . take evidence and evaluate the credibility of witnesses and thereby fully air any complaint that a disappointed litigant might have."  (Ex. X, pp. 18-19).  The State urged that an SVP respondent could file either a motion for rehearing under Florida Rule of Civil Procedure 1.530 within 10 days of the verdict, or a motion to set aside the judgment under Florida Rule of Civil Procedure 1.540(b) within one year from the entry of the final order committing him to state custody.  The State conceded, however, that neither rule expressly authorizes such a motion, and contended instead that "with appropriate relief <u>arguably</u> available to [petitioner]," his decision not to seek trial court review of the matter should be seen as a procedural bar.  (*Id.*, p. 19) (emphasis added).  Alternatively, the State argued that petitioner's IAC claim was without merit.  The state appellate court affirmed petitioner's SVP commitment without written opinion.

   It is well established that a federal court cannot presume that a state court has ignored its own procedural rules when the state court summarily denies or

summarily dismisses a claim.  *See Coleman*, 501 U.S. 722, 735-36, 111 S.Ct. 2546; *Kight v. Singletary*, 50 F.3d 1539, 1544-45 (11th Cir. 1995) (applying procedural bar where state court's summary dismissal did not explain basis for ruling); *Tower v. Phillips*, 7 F.3d 206, 209 (11th Cir. 1993) (applying bar where state court did not rule on claims presented).  However, in this case respondent concedes that there is not a procedural rule barring a civilly committed person from raising an IAC claim on direct appeal.[14]  Thus, this court cannot conclude with confidence that the state appellate court's denial of relief on this claim was based on a procedural bar as opposed to the merits.[15]

## C.    Clearly Established Federal Law[16]

---

[14]Respondent states, "[t]here has been no definitive Florida decision as to how such claims are to be litigated."  (Doc. 24, p. 30).

[15]Even assuming the state appellate court's denial of relief on this claim was based on a procedural bar, this court cannot conclude that petitioner's IAC claim is procedurally defaulted.  "A state court's rejection of a federal constitutional claim on procedural grounds will only preclude federal review if the state procedural ruling rests upon an 'independent and adequate' state ground." *Moore v. Campbell*, 344 F.3d 1313, 1320 (11th Cir. 2003) (quoting *Coleman v. Thompson*, 111 S.Ct. 2546 (1991)), *disagreed with on other grounds, Hurth v. Mitchem*, 400 F.3d 857 (11th Cir. 2005).  Only rules that are "firmly established and regularly followed" qualify as adequate state grounds for precluding substantive review of federal claims.  *Ford v. Georgia*, 498 U.S. 411, 111 S.Ct. 850, 857, 112 L.Ed.2d 935 (1991); *Hurth*, 400 F.3d at 860 ("In order to serve as the basis for a procedural bar in federal habeas proceedings, a state rule must be firmly established and regularly followed.").

Given respondent's concession that "[t]here has been no definitive Florida decision as to how such claims are to be litigated," (doc. 24, p. 30), this court cannot find that the proposition urged by the State on direct appeal, that petitioner's IAC claim was procedurally barred because such claim arguably could have been raised in a motion filed in the trial court under Fla.R.Civ.P. 1.530 or 1.540 -- is a "firmly established and regularly followed" procedural rule.

[16]Petitioner argues that the standard set out in *Strickland* does not apply in the civil commitment context because *Strickland* "requires an unreasonably low standard of legal assistance."  He urges this court to adopt a more rigorous standard such as those articulated by the Montana and Pennsylvania courts in *In re K.G.F.*, 29 P.3d 485 (Mont. 2003) and *In re Huthinson*, 421 A.2d 261 (Pa. Super. 1980), *aff'd*, 454 A.2d 1008 (Pa. 1982).  This argument is unpersuasive for two primary reasons.  First, as explained by respondent, the commitment process in Montana is different from that of the Ryce Act in several significant respects.  Thus, *K.G.F.* appears to be a purely local (to Montana) phenomenon.  (*See* respondent's discussion at Doc. 24, pp. 32-33).  Further, *Hutchinson* does not support petitioner's position because: (1) that case involved proceedings that were very accelerated; (2) it was decided four years prior to *Strickland*; and (3) the standard eventually adopted by the Pennsylvania Supreme Court was the same as that for criminal cases -- "whether counsel's actions

In order to prevail upon a claim of ineffective assistance of counsel, the petitioner must prove that:  (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).   "The purpose of ineffectiveness review is not to grade counsel's performance."  *Chandler*, 218 F.3d 1305, 1313 (11th Cir. 2000) (citing *Strickland*).  In evaluating counsel's performance, reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable, professional assistance.  *Chandler* at 1314.  "Therefore, the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir.), *cert. denied*, 513 U.S. 899, 115 S.Ct. 255, 130 L.Ed.2d 175 (1994).  In evaluating the reasonableness of counsel's actions, a court must make "every effort . . . to eliminate the distorting effects of hindsight" and must evaluate the reasonableness of counsel's performance "from counsel's perspective at the time."  *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.  As the Eleventh Circuit has emphasized:

> We must avoid second-guessing counsel's performance:  "[I]t does not follow that any counsel who takes an approach we would not have chosen is guilty of rendering ineffective assistance."  *Waters* [*v. Thomas*, 46 F.3d 1506], 1522 (en banc).  Nor does the fact that a particular defense ultimately proved to be unsuccessful demonstrate ineffectiveness.

---

had a reasonable basis designed to effectuate his client's interests."  *Hutchinson*, 454 A.2d at 1011 & n. 6.  The second reason this court finds petitioner's argument unpersuasive is that petitioner has cited only State cases for his proposition.  Every federal case that has recognized a right to effective assistance of counsel in involuntary commitment proceedings has applied the *Strickland* standard.  *E.g., Woolley v. Ashbridge*, --- F.Supp.2d ---, 2006 WL 13102 (M.D. Pa. Jan. 3, 2006) (applying *Strickland* standard to federal habeas petitioner's claim that he received ineffective assistance of counsel during his civil commitment proceeding); *Woodard v. Mayberg*, 242 F.Supp.2d 695 (N.D. Cal. 2003) (same); *Poole v. O'Keefe*, 2002 WL 550961 (D. Minn. 2002) (unpublished decision) (same).

*Chandler* at 1314 (footnote omitted).  Moreover, an ambiguous or silent record is not sufficient to disprove the strong and continuing presumption of effective representation.  Where the record is incomplete or unclear about counsel's actions, it will be presumed that he did what he should have done, and that he exercised reasonable professional judgment.  *Chandler* at 1314 n.15.

In order to meet the prejudice prong of the *Strickland* standard, petitioner must allege more than simply that the unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding."  466 U.S. at 693, 104 S.Ct. at 2067.  Instead, the petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.,* at 694, 104 S.Ct. at 2068.  Without support in the record, bare allegations that the petitioner was prejudiced by counsel's performance are not sufficient.  *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir.), *cert. denied,* 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d 133 (1987).  In applying *Strickland* the court may dispose of an ineffective assistance claim if petitioner fails to carry his burden on either of the two prongs.  *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  *Strickland*, 466 U.S. at 698, 104 S.Ct. at 2070; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999).

C.     Federal Review of State Court Decision

Petitioner contends trial counsel was ineffective for the following reasons: (1) counsel failed to object to Dr. Cook's opinion testimony on whether petitioner would reoffend; (2) counsel failed to object to Dr. Falb's testimony that petitioner viewed pornography, used prostitutes and had extra-marital affairs; and (3) counsel failed to object to the prosecutor's improper remarks during closing argument that the jury should send petitioner a message to get treatment.  Petitioner contends that

"while failure to object to one of the error[s] may have been harmless, the cumulative effect of not objecting to any of the errors deprived Mr. Robertson of a fair trial." (Doc. 17, Mem. at 37).

> i.    Failure to object to Dr. Cook's testimony on whether petitioner would reoffend

At trial, Dr. Patrick Cook testified that he was a licensed psychologist who worked for the Department of Children and Families.  (Ex. U, pp. 64-67).  He reviewed the reports submitted by Drs. Rhyne and Falb concerning petitioner, which included historical information drawn from police, court and prison records.  Based on the information in those reports, Dr. Cook recommended that the Department ask the State Attorney's Office to initiate sexually violent predator proceedings against petitioner.  (*Id.*, pp. 73-74).  He noted specifically that petitioner had four arrests and two convictions for sexually violent offenses, and numerous arrests for other crimes.  In the cases where petitioner was not convicted of sex crimes, the circumstances of the crimes were similar to those where petitioner had been convicted, except that the victims had dropped charges.  (*Id.*, pp. 74-75).  Dr. Cook noted that petitioner was sentenced to 60 years in prison in 1975 for rape and that after spending 20 years in prison he re-offended within six months of his release. (*Id.*, pp. 75-76).  He also testified that he did not diagnose petitioner since he had not evaluated him.  (*Id.*, pp. 83-84).  He did say, however, that in his opinion petitioner would have serious difficulty in controlling his behavior unless he was committed to state custody for care, confinement and treatment.  (*Id.*, p. 86).

Petitioner asserts that the testimony concerning his likelihood to reoffend was incompetent because Dr. Cook did not examine petitioner.  Relying on *Jones v. State*, 289 So.2d 725 (Fla. 1974), which held that a qualified expert may testify to his opinion concerning a defendant's mental condition based either upon (1) personal examination, (2) testimony in the case, if he has been in court and heard it all, or (3) hypothetical questions propounded by counsel, *id.*, at 727, petitioner argues that Dr. Cook's testimony was inadmissible because Cook did not personally examine

petitioner.  Additionally, petitioner argues, Florida law does not allow an expert to assume the facts which form the basis of his opinion.  *Jackson County Hospital Corp. v. Aldrich*, 835 So.2d 318, 326 (Fla. 1st Dist. Ct. App. 2003).

As respondent correctly argues, the cases cited by petitioner do not provide a basis for objection to, or exclusion of, Dr. Cook's testimony.  *Jones* stands for the proposition that an expert cannot diagnose someone without conducting an examination.  That was not an issue here, since Dr. Cook did not give a diagnosis of petitioner's mental condition; rather he gave an opinion on petitioner's likelihood of reoffending and on whether petitioner would have serious difficulty in controlling his behavior unless confined.  (Ex. U, p. 86).  Furthermore, the Ryce Act context differs so substantially from the situation in *Jackson County Hospital, supra*, that that case is inapposite.  *Jackson County Hospital* involved expert testimony in a medical malpractice case where the plaintiffs' sole expert on the alleged breach of the standard of care gave testimony that was inconsistent with the record and assumed facts not in evidence.  Here, following the standard practice, Dr. Cook reviewed the reports of Drs. Falb and Rhyne and reached a conclusion similar to theirs.

The foregoing leads the undersigned to conclude that had counsel objected to Dr. Cook's testimony on petitioner's likelihood to reoffend, there is no reasonable probability the objection would have been sustained and the testimony excluded.  Moreover, even if the court determined that counsel erred in failing to object, petitioner cannot establish prejudice.  Dr. Cook's opinion was not the sole evidence of petitioner's propensity to reoffend.  Drs. Falb and Rhyne gave similar opinions.  Thus, petitioner cannot justifiably argue there is a reasonable probability that but for Dr. Cook's testimony, he would not have been committed.

          ii.     **Failure to object to testimony that petitioner viewed pornography, used prostitutes and had extra-marital affairs.**

Next, petitioner argues that counsel was ineffective for failing to object to Dr. Falb's testimony that petitioner viewed pornography, used prostitutes and had extra-marital affairs.  Dr. Martin Falb testified that he is a licensed psychologist who evaluated petitioner for commitment after reviewing police, court and prison records, and conducting an interview with petitioner.  (Ex. V, pp. 138, 142-43).  As part of the interview, Dr. Falb compiled a sexual history of petitioner.  (*Id.*, pp. 149-50).

In discussing his sexual history, petitioner told Dr. Falb that his first consensual sexual encounter occurred when he was approximately 12 to 13 years old, and was with a woman who was 30 to 40 years old at the time.  (*Id.*, pp. 150-51).  Such a relationship was not "normal" according to Dr. Falb.  (*Id.*, p. 151).  As he "generally" does, Dr. Falb asked petitioner about pornography.  He testified that petitioner acknowledged that he had had access to pornography in prison; that he viewed pornographic materials "[e]very time someone g[ot] a new magazine, about every 2 months;" and that he had very recently viewed pornographic materials.  (*Id.*, p. 152).  Dr. Falb further testified that he considered it "significant" that petitioner reported having "many affairs" while married.  (*Id.*, p. 153).  Also significant to Falb was that at the time petitioner allegedly committed the sexual offenses in 1974 and 1975, he was married, which indicated to the doctor "that even though he [petitioner] was charged with sexual offenses, . . . he was involved in what should have been considered an appropriate female relationship."  (*Id.*, p. 153).  Additionally, Dr. Falb considered "significant" petitioner's report of having used prostitutes on a frequent basis, and of having had "probably more than 100" one-night stands.  (*Id.*, pp. 153-54).  Dr. Falb went on to testify as to his diagnosis of petitioner as having paraphilia NOS, non-consenting; and personality disorder NOS with anti-social features.  (*Id.*, pp. 170-82).  He further opined that petitioner had serious difficulty controlling his behavior.  (*Id.*, pp. 173-74).

Petitioner asserts that Dr. Falb's testimony concerning affairs, pornography and prostitutes was inadmissible because none of these acts involved violence or sexual activity with non-consenting partners; therefore the testimony was "irrelevant to the issue of whether Mr. Robertson would have difficulty controlling his behavior toward *nonconsenting* persons." (Doc. 17, Mem. at 38). Relying on *Page v. Zordan*, 564 So.2d 500 (Fla. 2nd Dist. Ct. App. 1990), petitioner argues that presenting such testimony through an expert witness was "particularly unfair." *Id.*, at 501.

*Page* was a civil suit where compensatory and punitive damages were sought against the defendant based on allegations of lewd and lascivious conduct on a child. An expert was allowed to testify regarding the defendant's viewing of pornography, and his alleged peeping into the child's mother's bedroom twenty years prior. This evidence was offered to prove the defendant's propensity to commit the alleged lewd assault. The court explained that the action "essentially was a contest between the credibility of [the child's] story and the credibility of [the defendant's] denial," and that "the purpose of th[e] testimony was to put before the jury expert opinion as to the credibility of [the child] and the culpability of [the defendant]." *Id.*, at 501-02. Finding such testimony to have "impermissibly intruded into the function of the jury to determine such questions of credibility," the court held that the expert testimony was inadmissible as irrelevant to the issues and highly prejudicial to the defendant, especially since it was presented through expert testimony. *Id.*, at 502.

Unlike the expert testimony at issue in *Page*, the purpose of Dr. Falb's testimony in this case was to explain the factors he felt "significant" in conducting his clinical evaluation of petitioner and in arriving at his ultimate opinion concerning petitioner's diagnosis and propensity to reoffend. In Ryce Act proceedings, propensity evidence is relevant, as one of the elements of commitment is a respondent's propensity to commit certain violent sexual acts. Dr. Falb testified that petitioner's hundreds of one-night stands, extra-marital affairs, history of frequent

use of prostitutes and frequent viewing of pornography were factors (a) he found in the record or from his interview with petitioner, (b) were revealed in the course of taking a "sexual history" from petitioner (something Dr. Falb does in every interview) and (c) were used in evaluating petitioner and as part of the basis for his conclusion as to whether petitioner qualified as a violent sexual predator, including the likelihood of petitioner reoffending in the future.  *See Westerheide v. State*, 767 So.2d 637, 658-59 (Fla. 5th Dist. Ct. App. 2000) (holding that expert testimony regarding the likelihood of reoffense under the Act assists the trier of fact in understanding the evidence and in determining facts in issue and should be admissible provided the opinions are rendered by witnesses who are qualified), *decision approved by* 831 So.2d 93 (Fla. 2002).  This evidence also spoke to the importance of sexual activity in petitioner's life, and to petitioner's ability to control his sexual behavior.  Dr. Falb considered this information about petitioner's sexual history "significant," regardless of whether the affairs and one-night stands were consensual.

The foregoing leads this court to conclude that had counsel objected to Dr. Falb's testimony concerning the foregoing, the objection would not have been sustained nor the testimony excluded.  Thus, counsel was not deficient for failing to make it.  Moreover, petitioner cannot be prejudiced by his counsel's failure to make a losing objection.

### iii.    Failure to object to improper closing argument

Petitioner's final contention is that counsel was ineffective for failing to object to the prosecutor's remarks in closing argument that "it's time that we, the State of Florida, the community, needs to [sic] tell him, 'Things need to change, Mr. Robertson.  You need to get treatment.'" (Ex. V, p. 294).  Relying on *Allstate Ins. Co. v. Buzdigan*, 776 So.2d 1104 (Fla. 5th Dist. Ct. App. 2001) and *Kloster Cruise Ltd. v. Grubbs*, 762 So.2d 552 (Fla. 5th Dist. Ct. App. 2000), petitioner asserts that Florida

courts consider closing arguments improper and fundamentally unfair when they urge juries to "send a message."  (Doc. 17, Mem. at 39).

The record reveals that this comment was a fair comment.  In closing statements, Mr. Robertson's counsel had devoted considerable time to arguing that the quality of treatment was not very good.  (Ex. V, pp. 286- 87).  In rebuttal, the State argued that the likelihood of success was not the issue; rather, the issue was that petitioner needed treatment:

> The issue is whether this man needs treatment.  The State of Florida is doing the best it can with the resources it has to provide a treatment facility.  Maybe [Mr. Robertson's counsel] doesn't agree with it; Mr. Robertson doesn't agree with it; other people may not agree with it; but it's the best that we've got.
>
> The issue is not whether it can be better; the issue is whether this man, Mr. Robertson, needs the treatment. . . . [A]ll of the other witnesses from the expert side for the State agreed that Mr. Robertson is in need of treatment.
>
> . . . .
>
> Mr. Robertson has a proven track record of sexually assaulting women and then not accepting responsibility for it.  Nothing's changed.  And it's time that we, the State of Florida, the community, needs to tell him, 'Things need to change, Mr. Robertson.  You need to get the treatment.'"

(*Id.*, pp. 293-94).

Further, even if the remark was improper and counsel was ineffective for failing to object to it, the state court did not unreasonably apply *Strickland* when it denied relief, as petitioner cannot show prejudice.  In light of the overwhelming evidence against petitioner, there is no reasonably probability that but for this single comment, petitioner would not have been committed.[17]

---

[17]The evidence against petitioner is summarized in respondent's answer. (Doc. 24, pp. 7-15).  This is an accurate summary of the evidence adduced at trial, and it is incorporated herein by reference. (Ex. V).  Where there are conflicting inferences and where disputes exist, this Court must presume that the jury resolved such conflicts in favor of the prosecution, and must defer to that

The state court's adjudication of petitioner's ineffective assistance claim did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1); *Williams, supra*.

Accordingly, it is respectfully RECOMMENDED:

That the second amended petition for writ of habeas corpus (doc. 17) challenging petitioner's civil commitment in the case of *In Re: The Commitment Of Willie Ben Robertson*, in the Circuit Court of Escambia County, Florida, case number 02-858 be DENIED, and the clerk be directed to close the file.

At Pensacola, Florida this 5th day of April, 2006.


/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).

---

resolution.  *Martin v. State of Alabama*, 730 F.2d 721,724 (11th Cir. 1984).